[Civ. No. 2. Fourth Appellate District.—November 18, 1929.]

FRED H. RICHMAN, Appellant, v. BANK OF PERRIS (a Corporation) et al., Respondents.

John E. Biby, Harry C. Biby and Biby & Biby for Appellant.

A. Heber Winder for Respondents.

BARNARD, J.—This is an action in equity, brought to set aside a sale of certain bank stock made under a pur-

ported assessment, and to declare the plaintiff the owner of said stock.

On a previous appeal (*Richman* v. *Bank of Perris*, 73 Cal. App. 321 [238 Pac. 754]), it was held that a demurrer to the complaint had been improperly sustained, that the complaint stated a cause of action, and the case was reversed with directions to permit an answer. An answer having been filed and a trial had on the issues set up, the matter is now before us on the facts alleged in both the complaint and the answer, so far as the same were proved or admitted at the trial. These facts, so far as they affect the decision of this case, are as follows:

The defendant bank is a corporation organized under the laws of the state of California, with a capital stock of 250 shares of the par value of $100 each. The articles of incorporation provide for three directors. On April 15, 1919, the defendants Stewart owned 209 of the 250 shares of stock outstanding. On April 16, 1919, one J. B. Moffere purchased these 209 shares of stock and new certificates were issued by the corporation as follows: To Moffere, 199 shares; to Louis Vaiani, 5 shares, and to Louis Casaretto, 5 shares. The shares were issued to the last-named persons in order to qualify them to act as directors. The circumstances of the purchase are not in evidence. On the same day, April 16, 1919, the old board of directors of the bank met and resigned, and Moffere was elected a director and president; Vaiani a director and secretary, and Casaretto was elected a director. On the same day, or on the next day, April 17, 1919, which was the day he was last seen at the bank, the new president, Moffere, robbed the bank of a little over $40,000 in cash and securities and disappeared, and up to the date of the trial (July 14, 1926) had never been apprehended. On April 18, 1919, the Stewarts began a search for Moffere, and on April 21, 1919, a well-known detective agency was employed to endeavor to locate him. On the same day the state superintendent of banks closed the bank and placed its affairs in charge of a deputy, H. P. Maynard. On April 22, 1919, a warrant was issued for the arrest of the absent Moffere and placed in the hands of the sheriff. Continuously from that time the detective agency and the sheriff made frequent reports of their inability to find

Moffere. On May 24, 1919, the superintendent of banks finding the capital of the bank impaired, "resulting from the felonious actions of your newly elected president, J. B. Moffere," directed that its capital be repaired and fixed the amount necessary at $40,000, and further directed that an assessment of $160 a share be levied.

At all times herein involved the by-laws of the bank provided:

"Special meetings of the Board may be called by the President on one day's notice to each director, either personally or by wire; special meetings may be called in like manner and on like notice, on the written request of two directors."

On May 26, 1919, the two available directors signed the following instrument in writing:

"Los Angeles, May 26, 1919.

"Mr. James B. Moffere,

"President of the Bank of Perris,

"Huntley Apartments, Los Angeles, Calif.

"Dear Sir:

"The undersigned, being a majority of the Board of Directors of the Bank of Perris, hereby request a special meeting of said board, to be called and held in the Bank of Perris at one o'clock in the afternoon of Tuesday, the 27th day of May, 1919.

"Louis Vaiani,

"Louis Casaretto."

On the same day the said two directors caused the original of said instrument to be delivered at the Huntley Apartments in Los Angeles, which was the last-known place of residence of the said Moffere, and obtained from the proprietor of said apartments the following written instrument:

"Los Angeles, Cal., May 26, 1919.

"This is to certify that Mr. James B. Moffere, formerly a tenant of the Huntley Apartments, 1207 West Third Street, Los Angeles, was not here present (nor has he been for over thirty days, his present whereabouts being unknown here) to receive a letter personally delivered by messenger, said letter being a call to the meeting of the Directors of

the Bank of Perris, addressed to James B. Moffere, Huntley Apartments, and signed by Louis Vaiani and Louis Casaretto, as Directors.

"(Signed) HUNTLEY APARTMENTS,
"By E. BLALACK.
"Witness: H. E. MAYNARD."

On May 27, 1919, the said Vaiani and Casaretto, as directors of said bank, met and caused to be entered in the minutes of the proceedings of the board of directors a resolution, of which the following is a copy:

"Whereas, Charles F. Stern, Superintendent of Banks of the State of California, has made requisition upon the Bank to repair its Capital in the sum of $40,000, therefore, be it resolved and ordered that an assessment of $160.00 per share be levied upon each share of the stock of this corporation, said assessment to be payable on June 26, 1919, to Louis Vaiani, the Secretary and Cashier of this Bank, at the banking room of this Bank in the town of Perris, County of Riverside, State of California. Any stock upon which this assessment shall remain unpaid upon the 26th day of June, 1919, will be delinquent and advertised for sale at public auction, and unless payment is made before, will be sold to pay the delinquent assessment, together with costs of advertising and expenses of sale, or will be sold at private sale and without such public notice."

The court found that at the time this resolution was passed the said Moffere was absent from the state of California; that he was a fugitive from justice, having robbed the defendant bank of over $40,000; that his whereabouts were unknown to any of the defendants and to any person connected with the said bank; that every effort had been made to locate him and personally notify him of said meeting, but that owing to these facts and to his absenting himself, it was impossible to locate him and to give him notice of said or any meeting of the board of directors of said bank. The court also found that each of the defendants herein knew that said purported meeting of said directors was held without any notice to the absent director, Moffere, other than that hereinbefore mentioned, and without his being present; that it was not held on a regular meeting day, and that the said meeting was not called by the president. The

court also found that the call for said special meeting, made as above outlined, was in accordance with the provisions of the by-laws; that everything possible was done to procure the service of the notice on the said Moffere, and that the failure to personally serve him was due wholly and entirely to his absence from the state, under the circumstances above indicated. The court further found that none of the owners of the outstanding shares of stock in the bank paid said assessment, except one man, who made a partial payment; that a notice of intention to sell such stock was not published in any newspaper of general circulation, but such notice was served upon each of the stockholders by mail, and that each and all of the stockholders had personal notice of such intention to sell such stock.

It was further found that on May 28, 1919, three individuals, acting as agents for all of the defendants herein except the Bank of Perris, made a written offer to pay to the defendant Bank of Perris the sum of $40,000 in cash, in payment of the amount assessed, as above mentioned. On the same day the bank mailed to each stockholder, at his last known address, a notice reading as follows:

"Perris, California, May 28, 1919.
"Dear Sir:

"Please be advised that we have this day been offered full payment of the amount assessed against your stock of this corporation, a notice of which assessment was mailed to you at your last known address, a copy of which offer is enclosed. If you refuse or neglect to pay such assessment on or before July 14, 1919, please be advised that such offer will be accepted by the Board of Directors of this Corporation.

"Yours very truly,
"BANK OF PERRIS,
"By LOUIS VAIANI, Sec."

On July 15, 1919, the said two directors, Vaiani and Casaretto, met at the office of the bank and by resolutions which were entered on the minutes of the proceedings of the directors canceled 249 shares of stock, including the 209 shares then owned by said Moffere, and declared the said stock to be null and void, and issued new shares in lieu of the shares purported to have been canceled to the de-

fendants in this action, excepting the defendant Bank of Perris. After the new certificates were issued the defendants, other than the Bank of Perris, acquired all other issued stock and then claimed to own the entire outstanding stock of the bank. The court found that the above proceedings were the only proceedings under or by which the stock owned by Moffere was canceled, or attempted to be canceled. On July 17, 1919, the superintendent of banks withdrew from the control of the bank, and on August 9, 1919, a new board of directors was elected.

On August, 14, 1922, the plaintiff herein commenced an action in Los Angeles County against the said Moffere, and on August 15, 1922, a writ of attachment in said action was levied upon the shares of stock in said bank, alleged to be the property of Moffere and to have been illegally canceled, being the 209 shares above referred to. Later, plaintiff recovered judgment against Moffere in said action, in the sum of $34,027.50, and an execution was issued and levied upon said stock. Subsequently, Moffere's interest in said stock was sold at execution sale to the plaintiff, for the amount of his judgment. The plaintiff presented his certificate of sale to the bank, and demanded the issuance to himself of the stock claimed to have been owned by Moffere, which demand was refused. The court found that from and after July 15, 1919, said Moffere was not entitled to any of the rights of a stockholder in said bank, and that the defendants, other than the Bank of Perris, are the legal owners of the outstanding stock in said bank. This appeal is from a judgment in favor of the defendants and that the plaintiff take nothing.

The appellant contends that the purported sale or cancellation of the Moffere stock is void, the meeting of the directors at which the proceedings were initiated not having been called upon legal notice, and that as a consequence, appellant is the owner of said stock, having acquired the same through the execution sale. California Jurisprudence, volume 6, page 1055, states the rule relied upon by appellant, as follows: "It is the general rule, therefore, that a special meeting held without notice is void, and the directors present at such meeting cannot perform any valid corporate act. The provision that a majority of the whole

number of trustees shall form a board for the transaction of business and every decision of a majority of the persons duly assembled as a board shall be valid, does not change the rule.''

While respondents freely admit this to be the rule, they strongly urge that the circumstances here present an emergency which forms an exception to the general rule. They insist that such an exception arises where three conditions prevail:

1. The existence of an emergency.

2. A reasonable necessity for immediate action.

3. The impossibility of giving notice.

They argue that these conditions were all present in this case; that a much needed and only bank in a small community had been robbed, almost double its capital wiped out, and its doors closed; that it was not only impossible to serve the absent director, but this impossibility arose from his own crime and the fact that he intentionally secreted himself; that it was necessary for immediate action to be taken to rehabilitate the bank by an assessment, in order to save the financial structure of the community, and to carry out the orders of the state superintendent of banks; that it was necessary to do this within sixty days, and to meet this sudden necessity, the remaining directors acted under the advice of the superintendent of banks; and that they made the best service of the notice possible under the circumstances. Therefore, as an exception to the general rule, they contend that the remaining directors were legally justified in holding the meeting and levying the assessment involved. In support of their contention that there is an exception to the general rule, in such cases of emergency, respondents cite a number of cases from foreign jurisdictions, including the following: *Chase* v. *Tuttle,* 55 Conn. 455 [3 Am. St. Rep. 64, 12 Atl. 874] ; *Bank of Little Rock* v. *McCarthy,* 44 Ark. 473 [29 Am. St. Rep. 60, 18 S. W. 759] ; *Smith* v. *Sinaloa Land & Fruit Co.,* 42 Utah, 445 [132 Pac. 556] ; *Doernbecher* v. *Columbia City Lbr. Co.,* 21 Or. 573 [28 Am. St. Rep. 766, 28 Pac. 899] ; *Re Lisk Mfg. Co.,* 167 Fed. 411; *Singer* v. *Salt Lake Copper Co.,* 17 Utah, 143 [70 Am. St. Rep. 773, 53 Pac. 1024] ; *Stiewel* v. *Webb Press Co.,* 79 Ark. 45 [116 Am. St. Rep. 62, 94 S. W.

915] ; *Edgerly* v. *Emerson,* 23 N. H. 555 [55 Am. Dec. 207] ; *In re Kenwood Ice Co.,* 189 Fed. 525. In addition to these authorities, respondents further rely on certain California cases which, it is contended, show a tendency to let down on the strict rule that notice is necessary under all circumstances, and in which, it is asserted, the courts have swept aside strict and exclusive compliance with the requirements of the statutes. (See *Bell* v. *Standard Q. Co.,* 146 Cal. 699 [81 Pac. 17] ; *Scott* v. *Superior S. O. Co.,* 144 Cal. 140 [77 Pac. 817] ; *Whitcomb* v. *Giannini,* 43 Cal. App. 229 [184 Pac. 887] ; also, see Civ. Code, sec. 320a.)

Without going into details, it may be observed that the California cases cited fall far short of going to the extent of establishing such a tendency as supports the exception contended for. A careful study of the cases from other states relied upon by respondents discloses that while much appears in some of the decisions which apparently supports the contention that such emergency may. at times exist as to change the general rule, a large part of the language used is *dictum,* and in none of the cases cited does it clearly appear that there existed statutes and by-laws similar to those involved in this case. ■■■ The great weight of authority elsewhere, as well as in California, is to the effect that in the absence of a statute or a by-law providing to the contrary, notice of a special meeting of a board of directors must be given to each director, except when waived, as provided for in section 320a of the Civil Code. ■■■ It has been uniformly held in this state that an assessment levied at a special meeting held without notice to all of the directors is void. (*Gashwiler* v. *Willis,* 33 Cal. 11 [91 Am. Dec. 607] ; *Harding* v. *Vandewater,* 40 Cal. 77; *San Buenaventura Mfg. Co.* v. *Vassault,* 50 Cal. 534 ; *Thompson* v. *Williams,* 76 Cal. 153 [9 Am. St. Rep. 187, 18 Pac. 153] ; *Alta Silver Mining Co.* v. *Alta Placer Min. Co.,* 78 Cal. 629 [21 Pac. 373] ; *Smith* v. *Dorn,* 96 Cal. 73 [30 Pac. 1024] ; *Pauly* v. *Pauly,* 107 Cal. 8 [48 Am. St. Rep. 98, 40 Pac. 29] ; *Curtin* v. *Salmon River etc. Co.,* 130 Cal. 345 [80 Am St. Rep. 132, 62 Pac. 552] ; *Relley* v. *Campbell,* 134 Cal. 175 [66 Pac. 220] ; *Cheney* v. *Canfield,* 158 Cal. 342 [32 L. R. A. (N. S.) 16, 111 Pac. 92] ; *Raisch* v. *M. K. & T. Oil Co.,* 7 Cal. App. 667 [95 Pac. 662] ; *Beatty* v. *Rianda,*

34 Cal. App. 180 [167 Pac. 185]; *Richman* v. *Bank of Perris,* 73 Cal. App. 321 [238 Pac. 754].)

In *Cheney* v. *Canfield,* 158 Cal. 345 [32 L. R. A. (N. S.) 16, 111 Pac. 92], the court said: "It is the settled law that an assessment can be legally levied upon the capital stock of a corporation by the board of directors only at a regular meeting of the board or at a special meeting thereof, regularly called. (Citing cases.) As all proceedings whereby an assessment is levied upon the stock of a corporation, and under which a forfeiture of the stock of the stockholders may be had are *in invitum,* it is elementary law that they must be strictly followed. The levy of such an assessment can only be accomplished legally by a strict compliance with the statutory provisions relative thereto, or with the provisions of the charter of the corporation upon the subject."

█ Even if it be assumed that such an exception to the established rule as is here contended for could be sanctioned in an emergency where the necessity for immediate action is sufficiently great, we cannot agree that the existence of such a necessity here appears. Regardless of the general emergency that unquestionably existed, it appears without dispute that the superintendent of banks closed the bank in question and took charge thereof on April 21, 1919. It is apparent that the conditions were then known, and a *regular* meeting of the directors could have been held on May 3, 1919, no notice of such meeting being required by their by-laws. It also appears that the order, directing the repairment of the impaired capital by an assessment, was made by the superintendent of banks on May 24, 1919, and that another regular meeting, no notice of which was required, could have been held on June 7th, just eleven days later. Even if the proceedings were not started on May 3, 1919, and if sixty days' time following May 24, 1919, was not sufficient to enable the assessment to be levied and collected, if proceedings were begun at the next regular meeting, the bank superintendent had the power, under section 136 of the Bank Act, to take possession of the bank and "retain such possession until such bank shall resume business or its affairs be finally liquidated as herein provided." The bank was already closed and the superintendent of banks was

vested with a certain discretion in the matter. It is not to be assumed, with his order being complied with as rapidly as legally possible, that, if a brief further delay appeared necessary, his action would have been any different than it apparently was in other phases of this case, where every effort seems to have been made to co-operate and assist in the early opening of the bank. We feel that no sufficient necessity is here shown for holding this meeting, other than in a legal manner. It must therefore be held that, because of the failure to give a notice to all of the directors of the bank, in accordance with the by-laws, no legal meeting of the board of directors of defendant bank was held on May 27, 1919, and, therefore, that the purported assessment then levied was void.

However, a further question arises, namely, whether one may, under such circumstances as existed here, come into a court of equity, seeking its broad and liberal relief, while basing his claim on the strictest possible interpretation of law, without himself offering to do equity. If the offending president, Moffere, had himself filed this action asking the relief here prayed for, having by his own theft created this situation, which more or less naturally led the defendants in good faith to put into the corporation $40,000 in cash, in an apparently honest desire to save the bank and serve the community, can it be imagined that a court of equity, which, as has been said, "is founded in conscience," would have heard him, and extended its broad powers to assist him, unless, at least, he offered to return the $40,000, thus mistakenly but honestly furnished by the defendants for the benefit of the bank? We think not.

It is not in every case where there is a strict legal right to set aside a sale that a plaintiff may have relief in equity. His own actions are of the greatest importance. In *Sayre* v. *Gas Light & Heat Co.*, 69 Cal. 207 [7 Pac. 437, 10 Pac. 408], a sale of stock under an assessment was held invalid. But the plaintiff's assignor had considered the stock as practically valueless, and had waited until a reorganization of the company through the efforts of others had made the stock valuable, and it was held that although his legal right existed, it was incumbent upon him to act with diligence; and in equity he could not acquiesce as long as the stock

was worthless, but seek the aid of equity to reclaim it after it had become valuable through the exertion of others. It is the action of the party that is important, and while a different rule here applies, the actions of the defaulting president in this case were far more inequitable than the actions of the stockholder in the case just mentioned. While time does not confirm a void act (Civ. Code, sec. 3539), no one can take advantage of his own wrong (Civ. Code, sec. 3517). Nor is it merely in cases where the acts complained of are voidable and not void that this rule applies. An illegal contract is void, yet a party otherwise entitled to profit by this fact cannot be heard in equity if by his own acts he has participated in the wrong. In a proper case, equity may set aside the effect of a statute, in order to prevent an unconscionable thing, when the party seeking relief is an actor in the wrong involved. It would be hard to imagine a case where the conduct of a party seeking relief involves greater fraud or criminality than that found in the transaction that was the beginning and cause of the acts here complained of.

There is no rule of equity more firmly established than the one which says that "he who seeks equity must do equity." This maxim means, "that whatever be the nature of the controversy between two definite parties, and whatever be the nature of the remedy demanded, the court will not confer its equitable relief upon the party seeking its interposition and aid, unless he has acknowledged and conceded, or will admit and provide for, all the equitable rights, claims and demands justly belonging to the adversary party, and growing out of and necessarily involved in the subject matter of the controversy." (*Cox* v. *Hughes*, 10 Cal. App. at 561 [102 Pac. 956, 959].)

Nor is this rule that one who seeks equity must do equity confined to cases which were formerly cognizable only in equity. It applies as well to actions authorized by statute, and a plaintiff may be forced to do equity, as a condition of claiming rights fixed by statute and established law. (*Benson* v. *Shotwell*, 87 Cal. 49 [25 Pac. 249, 681]; *Hancock* v. *Plummer*, 66 Cal. 337 [5 Pac. 514]; *Brandt* v. *Wheaton*, 52 Cal. 430; *Holland* v. *Hotchkiss*, 162 Cal. 366 [L. R. A. 1915C, 492, 123 Pac. 258, 261].) In the last-named case,

which was a suit to quiet title as against certain tax deeds, the court said:

"Where the owner comes into equity asking equitable relief to remove or cancel a tax-deed or sale as a cloud upon his title, or to obtain a judgment which, in effect, will invalidate such sale or deed, the court should refuse any relief except upon the condition that he first repay to the tax purchaser, or his grantee or assignee, the taxes, penalties, interest, and costs justly chargeable upon the land and which the purchaser has paid at the sale, or afterward upon the faith of it, with legal interest from the time of such payment, less rents received, if any, if the purchaser has been in possession.

"It will be observed from the statements of the rule above given, that the defendant who has removed encumbrances or paid claims which the plaintiff ought justly to repay to him as a condition of obtaining the equitable relief sought by the suit, is entitled to interest on the sums so paid, and to have the repayment secured to him in some manner."

The particular kind of equitable remedy applied for is immaterial (*Couts* v. *Cornell*, 147 Cal. 560 [109 Am. St. Rep. 168, 82 Pac. 194]). The rule is applied where a debt has been barred by the statute of limitations (*Puckhaber* v. *Henry*, 152 Cal. 419 [125 Am. St. Rep. 75, 14 Ann. Cas. 844, 93 Pac. 114]). It applies where a party, as *actor*, is appealing to a court of equity in order to obtain some equitable relief. It may apply to, and its operation may obtain for a defendant, an equitable right or equitable relief which he could not otherwise have obtained, in cases where even equity would not have assisted him in a suit brought by him as plaintiff, for that purpose. (*Holland* v. *Hotchkiss, supra; Coleman* v. *County of Los Angeles*, 180 Cal. 714 [182 Pac. 440].) Irrespective of the illegality of the assessment in the case at bar, it is obvious that without the assessment and its payment the stock concerned would have been valueless. It is worth contending for now, because the defendants paid a large sum of money to remove a condition as serious, and as inescapable, as that in the case where taxes or assessments are justly due and a proper burden on the property involved and which must be repaid before an owner can, through the aid of equity, reclaim his property. Had Moffere protected his interests at the time, he would

have had to return or pay a similar sum to meet the conditions he himself created. The amount having been paid for him by the defendants, for the benefit of his stock, under the peculiar circumstances here existing, we feel that the rule under discussion would apply to him, if he were himself the plaintiff in this action.

Another rule closely associated with the one just mentioned is that "he who comes into equity must come with clean hands." In *Allstead* v. *Laumeister*, 16 Cal. App. 59 [116 Pac. 296, 297], the court quotes with approval the following explanation of the meaning of this rule, from Pomeroy's Equity Jurisprudence: "It says that whenever a party, who, as *actor*, seeks to set the judicial machinery in motion and obtain some remedy, has violated conscience, or good faith, or other equitable principle, in his prior conduct, then the doors of the court will be shut against him *in limine;* the court will refuse to interfere on his behalf, to acknowledge his right, or to award him any remedy.

"Any really unconscientious conduct, connected with the controversy to which he is a party, will repel him from the forum whose very foundation is good conscience."

The same opinion closes with this statement: "In any event, as stated, a court of conscience cannot consistently with the very principles which have occasioned its existence, lend its aid to relieve a party from the results of his own fraud." In *Chateau* v. *Singla*, 114 Cal. 91 [55 Am. St. Rep. 63, 33 L. R. A. 750, 45 Pac. 1015, 1016], which was an action in equity brought by one partner in an illegal business against another partner, the court said: "equity would no more entertain an action founded upon such contract for the relief of either of the parties to it, than it would entertain an action between two thieves for an equitable division of their plunder." It appears to us it would very closely approximate the situation just quoted, as an illustration of the ultimate extreme, if one who, by his own theft, has created a situation that has quite naturally led other interested parties to put into a corporation $40,000 in cash, to protect themselves and others from the result of his robbery, all to the great benefit of the corporation, could come into a court of equity and ask to have their rights ended and the property turned over to him, without any offer of reimbursement, on the ground that under a strict and stringent rule

of law, the proceedings under which they had so acted, although apparently followed in an effort to comply with the law, were in fact and unfortunately illegal. We cannot so hold. If it were a question of comparative equities, the fact that defendants had mistaken their strict legal rights would pale into insignificance beside the guilt of the absconder. It is true that as a general rule, equity will not aid a forfeiture or assist in divesting an estate, but in this case the parties who might be interested in sustaining the legality of the assessment and sale are not the *actors*. ■ The burden is on the one coming into a court of equity for relief to prove not only his legal rights but his clean hands, and he may not rely on any deficiencies that may be laid at the door of the defendants. Unless the plaintiff brings himself within its rules, equity will leave the parties where it finds them.

"A court of equity will not allow itself to become a handmaid to iniquity of any kind. It intervenes, not for the sake of the party who is benefited by the intervention, but for the sake of the law itself. It matters not that no objection is made by either party; when the court discovers a fact which indicates that the contract is illegal and ought not to be enforced, it will, of its own motion, instigate an inquiry in relation thereto." (*Kreamer* v. *Earl*, 91 Cal. 112 [27 Pac. 735, 737].)

■ This rule applies not only to illegal *contracts* but to illegal *transactions*. Equity will not aid the plaintiff when he has been guilty of merely fraudulent acts in the original transaction, which constitutes the foundation out of which the action for relief grows. (*Jose* v. *Utley,* 185 Cal. 656 [199 Pac. 1037] ; *Powell* v. *Bank of Lemoore,* 125 Cal. 468 [58 Pac. 83] ; *Brandt* v. *Krogh,* 14 Cal. App. 39 [111 Pac. 275].) The reasons for such a rule would seem even more potent where the guilt involved consists of acts not only fraudulent, but criminal. The proceedings, which it is the object of this action to set aside, were the natural result of the attempt of the defendants to remedy the effects of a crime.

In *Fritz* v. *Mills,* 170 Cal. 449 [150 Pac. 375, 377], where a party paid a mortgage in accordance with the directions of a judgment, and where the judgment was later reversed, the Supreme Court said:

"Upon these facts, we are of the opinion that the plaintiff is entitled to relief on account of the payment of said mortgage out of the money deposited in court. . . . The payment was made in good faith for the purpose of complying with the judgment given by the court and with the agreement which that judgment purported to enforce. The plaintiff cannot justly be made to suffer loss by such compliance and it would be inequitable to allow the defendants to profit by a successful appeal taken after the plaintiff, relying on that judgment, had complied with its terms by paying money on the defendant's debt which the plaintiff was otherwise under no obligation to pay."

And, in a later hearing of the same case (*Fritz* v. *Mills*, 48 Cal. App., at 335 [192 Pac. 92, 95]), the District Court of Appeal uses this language:

"If plaintiff shall now be denied the amount of money originally invested by her in this transaction, which is represented by the present judgment, and if appellants are allowed to take the property free and clear of a lien, toward the liquidation of which they contributed nothing, it would be manifestly unjust and contrary to the established principles of equity and justice. We can find no merit in the contention of appellants that the respondent does not come into court with clean hands."

While ordinarily money paid under a mistake of law is to be considered a voluntary payment, it may not always be inequitable if the inability of the plaintiff to establish his own case should result in protecting one who has made such an advance. It would be manifestly unjust and contrary to the principles of equity if one who, acting in good faith and on what, without doubt, appeared to be the best advice obtainable at the time, in an honest effort to protect himself, other stockholders, depositors and the public, has paid a large sum of money to meet such a serious emergency, as here existed, could, after several years, be dispossessed and compelled to surrender what has been built up and made valuable by his own money, in an action in equity brought by the very one whose wrongful acts caused the emergency, and who contributed nothing to remedy it, unless the guilty party be compelled to restore the money so paid in. This is especially true when he had himself received and kept the money for which the payment so made was a substitute.

And in this action we are asked not only to allow the wrong-doer to keep his plunder, without restoration, but to still further profit him by compelling his victims to pay an almost equal amount of his other debts.

If it be true that the attachment debtor, the absconder in this case, could not himself maintain this suit, without bringing himself within the rules of equity, we think the plaintiff here is in the same position. ■ The lien of an execution and attachment proceedings attaches to the real and not to the apparent interest of a judgment debtor in and to his property, and the purchaser at an execution sale takes subject to such existing liens and equities as the property was subject to in the hands of the debtor, unless he can show he purchased the same without notice, either actual or constructive, of the existence of such liens or equities. (*Whitney* v. *Sherman,* 178 Cal. 435 [173 Pac. 931]; *Riley* v. *Martinelli,* 97 Cal. 575 [33 Am. St. Rep. 209, 21 L. R. A. 33, 32 Pac. 579]; *De Celis* v. *Porter,* 59 Cal. 464; *Weston* v. *Bear River etc. Co.,* 6 Cal. 425.) The general rule has been applied to various kinds of cases. An execution sale of land in which the debtor has only an equitable estate operates only as an assignment of the equitable estate. (*Le Roy* v. *Dunkerly,* 54 Cal. 452.) Where the debtor is actually but a partial owner, the purchaser gets only his interest. (*Clark* v. *Cushing,* 52 Cal. 617.) An execution purchaser takes subject to a prior recorded mortgage, even though the record may not show a valid mortgage, as he is bound to make inquiry as to whether or not the record speaks the truth. (*Meherin* v. *Oaks,* 67 Cal. 57 [7 Pac. 47].) If the attachment creditor has no notice or knowledge to the contrary, he may rely on the entries on the books of a corporation as to who is the owner of the stock. (*West Coast Safety Faucet Co.* v. *Wulff,* 133 Cal. 315 [85 Am. St. Rep. 171, 65 Pac. 622].)

■ We think the converse is also true, and that where the stock has been transferred on the books of the corporation, an attachment creditor takes subject to any existing equities. That if he desires to obtain the benefits of the stock as it actually is, he must also assume its burdens as actually existing. A pledgee is protected in his rights as against attaching creditors if he has caused to be entered in the books of the corporation a statement of his interest in the stock.

(*Spreckels* v. *Nevada Bank*, 113 Cal. 272 [54 Am. St. Rep. 348, 33 L. R. A. 459, 45 Pac. 329].)

The plaintiff had no rights in this matter prior to the levy of his attachment. It is probably a reasonable inference from the facts that he had actual notice at that time, as it is improbable he would have attached stock standing in the name of other people on the books of the corporation, claiming the real owner to be Moffere, unless he had theretofore investigated and found out the actual situation. In any event, he must be held to have had constructive notice.

▆ Constructive notice in relation to interests in corporation stock is given, not by instruments filed in the office of the county recorder as in the case of interest in real estate, but by entries in the books of the corporation. ▆ The possession and control of the stock here in question and the business of the corporation, by the defendants, and the entries in the books, including the purported cancellation of Moffere's stock and the reissue of the substituted stock to the defendants, were constructive notice to plaintiff of any defects in Moffere's title, and of any equities existing against his interest, arising out of the transaction involved in this proceeding. Moffere had the right, subject to the rules of equity, to set aside the purported sale of his stock. The plaintiff acquired this same right but subject to, and not in disregard of, those same rules.

The plaintiff is claiming under a certificate based upon a sale under execution. Such a certificate conveys to him all the right which the debtor had in the property in question on the day the attachment was levied (Code Civ. Proc., sec. 699), and nothing more. The plaintiff stands in the shoes of the debtor. Such rights as the debtor had were limited by such restrictions as are placed upon their enforcement by the rules of equity. Long before the attachment was levied the debtor had himself taken the real value of his holdings, leaving only what was worse than an empty shell. The debtor having, by his own acts, placed himself where he must do equity before asking for relief, has to the same extent tied the hands of the plaintiff. "He who takes the benefit must bear the burden." (Civ. Code, sec. 3521.) The plaintiff is asking a court of equity to give him not only the benefits, without the burdens, of his debtor's position, but to include benefits created and put in by others.

On the first appeal of this case, when only the facts alleged in the complaint were before it, the court remarked that this was one of the "hard" cases that make "bad law." This was the case when, as then appeared, the defendants had voluntarily stepped in and, in a misguided manner, attempted to assist a bankrupt institution; when the judgment debtor appeared blameless, with no equities appearing against him. It now appears that the judgment debtor is not merely the unfortunate owner of stock in a bank that has become involved in difficulties, but is himself guilty of robbing the bank. When such equities as have been enumerated appear, and there appears such a failure to come within the rules of equity on the part of plaintiff's predecessor, which failure is binding on the plaintiff, it becomes unnecessary and impossible to so hold as to violate the conscience of a court of equity. When a man who has obtained control of the majority of the stock in a bank robs the bank, wrecks the institution, paralyzes the community and jeopardizes the rights of other stockholders and depositors, secretes himself so that notice of meetings may not be served on him, and when other interested parties have in good faith taken effective, but unfortunately not strict legal, measures to meet the emergency, and have replaced the money out of their personal funds, under such circumstances as exist in this case, his creditor may not after waiting for years, during which time values have increased, come in and, although having constructive if not actual notice of the existence of the equities, take the results of the labor and money of others, without doing the equity he asks for himself. To hold otherwise would be to hold that a court of equity is too feeble and impotent to do justice, and to require justice, in so new and so unusual a situation. We think that while the facts are new and passing strange, the fundamental principles of equity are broad enough to meet the situation. The framers of our statutes cannot foresee such contingencies as this, but equity opens many a door closed by the strict rules of law. To apply the strictest rules of technical law alone to this case, as demanded by the plaintiff, would work an injustice and would give to him not only the pound of flesh he claims, but also innocent blood to which he is not entitled.

Respondent contends that this action is barred by section 341, subdivision 2, of the Code of Civil Procedure,

and section 347 of the Civil Code. There is no merit in this contention. (*Herbert Kraft Co. Bank* v. *Bank of Orland,* 133 Cal. 64 [65 Pac. 143]; *Cheney* v. *Canfield,* 158 Cal. 342 [32 L. R. A. (N. S.) 16, 111 Pac. 92]; *Richmond* v. *Bank of Perris, supra.*)

The only other point calling for attention is one raised by a supplemental brief filed by appellant, in which attention is called to the case of *Wood* v. *Hamaguchi et al.,* 207 Cal. 79 [63 A. L. R. 861, 277 Pac. 113]. It is argued that in this case it was held that the State Bank Act is void and therefore, since the act under which the whole proceedings were taken resulted in the sale of the stock involved in this action is void, the purported sale of stock herein is also void, and the plaintiff entitled to recover. A casual inspection shows the fallacy of this argument. It was held in the case cited that Act 653 of Deering's General Laws, 1923, is void and unconstitutional, being in conflict with section 3, article XII, of the Constitution, because it attempts to create a personal liability for corporation debts, even when not incurred during the time the stockholders sought to be charged held the stock. But this case pointed out that provisions for assessments upon paid-up stock, enforceable only by the sale of the stock, do not deal with the personal liability of the stockholder and hence are not in conflict with this section of the Constitution. All of the proceedings in this case were taken, or attempted to be taken, under section 133 of Act 652 of the same General Laws, which provides only for the enforcement of assessments by the sale of the stock, with no attempt to create a personal liability. Not only does the case relied on not apply to the case at bar, but the plaintiff in asking equitable relief subjects himself to the requirements of equity, as above set forth.

For the reasons given the judgment is affirmed.

Sloane, P. J., and Marks, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on December 18, 1929, and a petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on January 16, 1930.

All the Justices concurred.